Db7ndafh                          Hearing

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                New York, N.Y.

4                   v.                       13 Cr. 150 (NRB)

5   MAHAMADOU DAFFE,

6                   Defendant.

7   ------------------------------x

8
                                             November 7, 2013
9                                            9:55 a.m.

10
    Before:
11
                    HON. NAOMI REICE BUCHWALD,
12
                                             District Judge
13

14                          APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BY:  CAROLINA FORNOS
17       SARAH McCALLUM
         Assistant United States Attorneys
18
    LORI COHEN
19       Attorney for Defendant

20

21

22

23

24

25

Db7ndafh                          Hearing

1          (In open court)

2          (Case called)

3          MS. FORNOS:  Good morning, your Honor.  Carolina

4    Fornos on behalf of the United States and with me is Sarah

5    McCallum and also Special Agent Karen Flanagan from the IRS.

6          MS. COHEN:  Good morning.  Lori Cohen representing

7    Mr. Daffe.

8          THE COURT:  Can we just get started with the

9    government's first witness, or is there something preliminary

10   that we have to do.

11         MS. FORNOS:  No, your Honor.  There are a couple of

12   other unrelated matters that we can certainly address after the

13   hearing.

14         THE COURT:  OK.

15         MS. FORNOS:  The first is that there has been a

16   superseding indictment issued in this case, and we would like

17   to arraign the defendant on that superseding indictment.  There

18   was also a protective order that the government submitted to

19   the Court for the Court's consideration.  Both of those matters

20   we can address after the hearing.

21         THE COURT:  We can also do it right now before I

22   forget.  Over 60 I might forget.

23         Ms. Cohen, have you received a copy of the superseding

24   indictment?

25         MS. COHEN:  I have, your Honor.

Db7ndafh                    Hearing

1          THE COURT:  Have you had a chance to review it with

2   Mr. Daffe?

3          MS. COHEN:  I have, your Honor.

4          THE COURT:  Do you waive its public reading?

5          MS. COHEN:  I do.

6          THE COURT:  Mr. Daffe, how do you plead to the

7   superseding indictment?  Guilty or not guilty?

8          THE DEFENDANT:  Not guilty.

9          THE COURT:  OK.  I will take a look at the protective

10  order later.

11         MS. FORNOS:  Yes, your Honor.

12         THE COURT:  That is fine.

13         MS. FORNOS:  Thank you.

14         It has been signed by Ms. Cohen and Mr. Daffe.  Your

15  Honor, before we proceed, we would also like to note for the

16  record that the government will stipulate that it will not use

17  the wallet or the contents of the wallet that were obtained

18  from Mr. Daffe on January 31, 2013 in the government's case in

19  chief.  Accordingly, we have notified Ms. Cohen of that matter

20  this morning, and we believe that that issue is moot.  The

21  suppression hearing should thus be limited to whether or not

22  there was consent to the remaining items taken that day, which

23  consist of two metal bins and the papers contained therein, a

24  laptop computer, the contents, a standalone tower computer, and

25  the iPhone.

Db7ndafh                          Hearing

1                    THE COURT:  All right.

2                    MS. FORNOS:  Just briefly, your Honor, the government

3      has one witness.  The government intends to call Special Agent

4      Anthony Ragusa, and we expect that the testimony will

5      demonstrate that there was lawful consent.

6                    May we proceed?

7                    THE COURT:  Yes.

8                    MS. FORNOS:  The government calls Special Agent

9      Anthony Ragusa.

10      ANTHONY RAGUSA,

11          called as a witness by the Government,

12          having been duly sworn, testified as follows:

13                    THE COURT:  You may be seated.

14                    MS. FORNOS:  May I inquire, your Honor?

15                    THE COURT:  Yes.

16     DIRECT EXAMINATION

17     BY MS. FORNOS:

18     Q.  Agent Ragusa, good morning.

19     A.  Good morning.

20     Q.  Could you please tell us where you are employed.

21     A.  I am employed with the IRS, criminal investigation.

22     Q.  What is your position with the IRS?

23     A.  Special Agent.

24     Q.  Could you generally describe your duties and

25     responsibilities as a special agent.

Db7ndafh                    Ragusa - cross

1   A.  To investigate financial crimes, mostly dealing in Title

2   18, Title 26 and Title 31 of the United States Code.

3   Q.  Generally what does that involve?

4   A.  Title 18 would be, for example, money laundering; Title 26

5   would be tax crimes; and Title 31 would be violations to the

6   Bank Secrecy Act.

7   Q.  How long have you been with the IRS?

8   A.  Seven and a half years, total five years as a special

9   agent.

10  Q.  Before you joined the IRS, where were you employed?

11  A.  With Ernst & Young in public accounting.

12  Q.  How long were you at Ernst & Young?

13  A.  About a year.

14  Q.  Special Agent Ragusa, let me direct your attention to

15  January 31, 2013.  Were you working that day?

16  A.  I was.

17  Q.  What was your assignment that day?

18  A.  I was the team leader of the arrest of Mr. Daffe.

19  Q.  What does it mean to be the team leader?

20  A.  You are in charge of the overall arrest and also the other

21  agents involved.

22  Q.  Did you, in fact, have an arrest warrant for Mr. Daffe that

23  day?

24  A.  I did.

25  Q.  Did you execute that arrest warrant?

Db7ndafh                     Ragusa - cross

1    A.  I did.

2    Q.  Could you tell us what time approximately the arrest took

3    place?

4    A.  About 8:40 in the morning.

5    Q.  Were you working alone?

6    A.  No.

7    Q.  How many people were with you?

8    A.  Seven others.

9    Q.  Can you please explain what's the first thing that happened

10   with respect to the arrest that morning?

11   A.  The first thing we did after we made the approach to the

12   apartment door was I knocked and announced at the door saying

13   we had an arrest warrant.  Mr. Daffe opened the door.  The

14   agents made entry, and I proceeded to ask Mr. Daffe to take a

15   seat while the agents made their way and conducted a security

16   sweep of the apartment.

17   Q.  Let's take a step back.  When Mr. Daffe first opened the

18   door, was he dressed?

19   A.  It looked like he was awake, yeah, like he was up for a

20   while.

21           MS. COHEN:  Objection.  That is not responsive.

22           THE COURT:  I think the question was was he dressed.

23   A.  Yes.

24   Q.  Was he in his pajamas?

25   A.  No, he was dressed.

Db7ndafh                    Ragusa - cross

1    Q.  What, if anything, did you do after you made your way into

2    the apartment?

3    A.  Before the agents made their security sweep, I identified I

4    was Special Agent Anthony Ragusa with the IRS criminal

5    investigation and that we had an arrest warrant for Mr. Daffe.

6    Q.  Did you get the sense that Mr. Daffe had been awake for

7    some period of time?

8    A.  I would say so.

9    Q.  As opposed to you waking him up when you knocked on the

10   door?

11   A.  Correct.

12   Q.  How large -- or can you describe the apartment?

13   A.  It was a small, one-bedroom apartment.  I would say no

14   bigger than 700, 800 square feet.

15   Q.  How many bedrooms?

16   A.  One bedroom.

17   Q.  What happened after you asked him to take a seat?

18   A.  The agents conducted a security sweep.  I showed Mr. Daffe

19   the arrest warrant we had.  I explained that he was under

20   arrest for basically identify theft the warrant said.

21   Q.  Do you see the defendant in the courtroom today?

22   A.  I do.

23   Q.  Can you point him out, please.

24   A.  Right there.

25           MS. FORNOS:  I would like the record to reflect that

Db7ndafh                    Ragusa - cross

1   Special Agent Ragusa has pointed to the defendant.

2            THE COURT:  It may so reflect.

3   Q.  Special Agent Ragusa, did you speak with Mr. Daffe?

4   A.  I did.

5   Q.  Did you perceive any language barriers with Mr. Daffe?

6   A.  No.

7   Q.  Any problems with him understanding English?

8   A.  No.

9   Q.  What was his demeanor like?

10  A.  He seemed calm and cooperative.

11  Q.  What happened?  What's the next thing happened?

12  A.  After I sat him down, I read him his Miranda rights.  I

13  asked him if he had -- after I read the Miranda rights to him,

14  I asked if he had any weapons on him.  He replied no, but just

15  to be safe I asked him to stand up, and I patted him down for

16  weapons to see if he had any on him, which he did not.

17  Q.  What, if anything, happened after you read him his Miranda

18  rights and patted him down?

19  A.  Some of the agents brought to my attention that during the

20  security sweep they had seen some financial documents or some

21  documents in the corner of the living room in two metal bins.

22  Q.  Were these out in the open or were they somewhere else?

23  A.  Yes, they were in the open.  They could be seen from where

24  we were in the living room in the corner.

25  Q.  Let me draw your attention to what's been marked as

Db7ndafh                         Ragusa - cross

1   Government Exhibits 4 and 5.  Do you recognize Government

2   Exhibits 4 and 5?

3   A.  I do.

4   Q.  What are they?

5   A.  Those are the metal bins containing the documents in

6   question.

7   Q.  Just to be clear, where exactly were they?

8   A.  They were in the corner of the living room kind of by where

9   his desk was in the corner of the living room.

10  Q.  In plain view?

11  A.  Yes.

12  Q.  What, if anything, happened after the agent notified you

13  that there were these documents?

14  A.  I asked what were the documents inside those metal bins, to

15  which Mr. Daffe explained financial records, work documents.

16  Q.  Did you ask anything else?

17  A.  I did.  I asked if it was OK if we looked through them.

18  Q.  What, if anything, did Mr. Daffe say?

19  A.  He replied that it was fine.

20  Q.  Did he say, no, you can't look at them?

21  A.  No.

22  Q.  Did he object to you reviewing the documents?

23  A.  No.

24  Q.  Did you threaten him in any way?

25  A.  No.

Db7ndafh                    Ragusa – cross

1   Q.  What was your tone when you asked him if you could review

2   these documents?

3   A.  About the same tone as now.

4   Q.  What was his demeanor like when you were having this

5   conversation with Mr. Daffe?

6   A.  He was calm and cooperative.

7   Q.  When you were having this conversation with Mr. Daffe, was

8   your gun drawn?

9   A.  No.

10  Q.  Was anybody yelling in the apartment?

11  A.  No.

12  Q.  How would you describe the atmosphere in the apartment?

13  A.  It was full of agents and himself, but it was generally

14  calm, no noise.

15  Q.  Was Mr. Daffe handcuffed at the time?

16  A.  No.

17  Q.  What happened after you obtained consent to look at the

18  documents?

19  A.  I asked him if it was OK if we take the documents with us,

20  to which he replied yes.

21  Q.  Did he indicate, no, you couldn't take them?

22  A.  No.

23  Q.  So you obtained consent to seize the documents?

24  A.  Right.

25  Q.  Were there any other discussions regarding any other items?

Db7ndafh                          Ragusa - cross

1    A.  Yes.  It was also brought to my attention that there was a

2    tower computer close by where the documents were as well as an

3    iPhone and a MacBook on the coffee table.

4    Q.  Let me draw your attention to what's been marked as

5    Government Exhibit 4.  Do you recognize that?

6    A.  I do.

7    Q.  What is it?

8    A.  That's the computer tower that was taken that day.

9              MS. FORNOS:  Your Honor, I would like to move to offer

10   all of these items, Exhibits 4, 5 and 6 into evidence.

11             MS. COHEN:  I have no objection, your Honor.

12             THE COURT:  All right.  I think either you misspoke or

13   I misheard.  Originally I thought you described the two metal

14   bins as 4 and 5, but they're really 5 and 6.

15             MS. FORNOS:  Yes, your Honor.  I did misspeak.  It's 5

16   and 6 and the computer is 4.

17             THE COURT:  OK.  Exhibits 4, 5 and 6 are received.

18             (Government's Exhibits  4, 5 and 6 received in

19   evidence)

20   BY MS. FORNOS:

21   Q.  What discussions, if any, were had with respect to the

22   computer tower?

23   A.  I explained that -- well, first I asked if it was OK if we

24   either looked through it or take it to the office to make a

25   copy of it.

Db7ndafh                     Ragusa - cross

1   Q.  What, if anything, did Mr. Daffe say?

2   A.  He said that was fine.

3   Q.  What was his demeanor when you were asking these questions?

4   A.  He seemed calm, very cooperative.

5   Q.  Did he ask you any questions?

6   A.  No.

7   Q.  What if anything happened after he said you could -- well,

8   what exactly did Mr. Daffe say?

9   A.  I first asked what was on the computer.  He replied it was

10  his work computer.  So after that I asked him is it OK if we

11  copy it or take it, which he replied we could.

12  Q.  Were there any other items discussed?

13  A.  We discussed the MacBook and his iPhone.

14  Q.  What, if any, discussions did you have with respect to the

15  iPhone and the MacBook?

16  A.  The same as the computer, if it was OK if we take it with

17  us.

18  Q.  What, if anything, did he respond?

19  A.  He replied it was OK.

20  Q.  Was Mr. Daffe handcuffed during this discussion?

21  A.  No.  He was handcuffed only after we were exiting the

22  apartment.

23  Q.  How long would you say you were in the apartment?

24  A.  I would say 35 minutes approximately.

25          THE COURT:  I'm sorry.  I just didn't hear.  How long?

Db7ndafh                         Ragusa – cross

1           THE WITNESS:  About 35 minutes.

2   Q.  Did you at any point inspect the documents that are in the

3   metal bins?

4   A.  I did briefly.

5   Q.  Do you think Mr. Daffe observed you looking at them?

6   A.  I believe he did.  Based on the size of the apartment and

7   also the proximity to myself and Mr. Daffe, he must have seen

8   what I was looking at.

9   Q.  Did he at any point say, no, don't look at them?

10  A.  No.

11  Q.  What happened after -- did you transport Mr. Daffe

12  anywhere?

13  A.  I transported him along with another special agent to 290

14  Broadway, which is our Manhattan main office for IRS criminal

15  investigation.

16  Q.  Why did you transport him there?

17  A.  For standard processing, which would include completing

18  U.S. Marshals forms, taking photos of Mr. Daffe, as well as

19  fingerprinting him.

20  Q.  While you were at 290 Broadway, did you provide Mr. Daffe

21  with a consent to search form?

22  A.  I did.

23  Q.  If you could turn to what's been marked as Government

24  Exhibit 1 that is in front of you.

25  A.  OK.

Db7ndafh                          Ragusa - cross

1   Q.  Can you take a moment and look at that document, please.

2   Do you recognize that document?

3   A.  I do.

4   Q.  What is it?

5   A.  It is the voluntary consent to a search of person,

6   premises, or conveyance form.

7   Q.  How do you recognize that document?

8   A.  My signature and date is at the bottom.

9          MS. FORNOS:  Your Honor, we offer Exhibit 1 into

10  evidence.

11         MS. COHEN:  No objection, your Honor.

12         THE COURT:  Received.

13         (Government's Exhibit 1 received in evidence)

14  Q.  Special Agent Ragusa, what, if anything, did you say --

15  what did you do with this form?

16  A.  I don't remember if we read it to Mr. Daffe verbatim, but

17  we did explain it to him at the very least and had him date and

18  sign it and we asked him if he understood it, to which he

19  replied yes.

20  Q.  Did he ask you any questions?

21  A.  No.

22  Q.  Did he sign the document?

23  A.  He did.

24  Q.  At approximately what time did he sign the document?

25  A.  10:40 in the morning.

Db7ndafh                        Ragusa - cross

1   Q.  What was his demeanor like when he was signing this

2   document?

3   A.  He appeared calm.

4   Q.  Did he ask you any questions?

5   A.  No.

6   Q.  Is there a reason that you didn't get his written consent

7   while you were in the apartment?

8   A.  Either we didn't have the form available at the time or we

9   generally in arrests try to make entry and exit as quick as

10  possible, which could be the reason why we didn't do it at the

11  apartment.

12  Q.  Is there any IRS policy requiring you to obtain consent --

13          MS. COHEN:  Objection.

14  Q.  -- in written form?

15          THE COURT:  Overruled.

16  A.  No.

17  Q.  What, if anything, happening after Mr. Daffe signed the

18  consent form?

19  A.  We processed him, as I mentioned before, and also we asked

20  if we could interview him.

21  Q.  If you could turn your attention to what's been marked as

22  Government Exhibit 2.  Please take a moment to take a look at

23  that.  Do you recognize this document?

24  A.  I do.

25  Q.  How do you recognize this document?

Db7ndafh                          Ragusa - cross

1   A.  My name and signature are at the bottom.

2   Q.  You, in fact, signed this document?

3   A.  I did.

4           MS. FORNOS:  Your Honor, we offer Exhibit 2 into

5   evidence?

6           MS. COHEN:  No objection.

7           THE COURT:  Received.

8           (Government's Exhibit 2 received in evidence)

9   Q.  Did you, in fact, hand this document to Mr. Daffe?

10  A.  I did.

11  Q.  Was it you or someone else?

12  A.  It might have been another special agent, but we did

13  explain it to him.  I don't know if we read it to him verbatim.

14  We probably did this one, but he said he understood.

15  Q.  Did he ask you any questions?

16  A.  No.

17  Q.  Did he sign this document?

18  A.  He did.

19  Q.  Did he sign it in your presence?

20  A.  Yes.

21  Q.  What was his demeanor when he signed this document?

22  A.  Again, calm and cooperative.

23  Q.  Did he, in fact, provide statements to you?

24  A.  Yes.

25  Q.  How long did you interview him for?

Db7ndafh                    Ragusa - cross

1    A.  Approximately an hour.

2    Q.  At any time during that interview did he say he did not

3    want to continue the interview?

4    A.  I don't remember.

5           MS. FORNOS:  Your Honor, I don't have any further

6    questions.

7           MS. COHEN:  May I inquire?

8           THE COURT:  Ms. Cohen.

9           MS. COHEN:  Thank you.

10   CROSS EXAMINATION

11   BY MS. COHEN:

12   Q.  Good morning, Agent.

13   A.  Good morning.

14   Q.  When you arrived at the location and Mr. Daffe opened the

15   door, what was he wearing?

16   A.  I don't remember.  It wasn't pajamas and it wasn't like how

17   we are, but I remember he was dressed.

18   Q.  You remember he was dressed?

19   A.  Yes.

20   Q.  But you don't remember what he was wearing?

21   A.  Not exactly, no.

22   Q.  When you say not exactly, do you have a vague memory, or is

23   it that you don't remember?

24   A.  I don't remember.

25   Q.  When you came into the apartment, how many agents were with

Db7ndafh                          Ragusa - cross

1    you?

2    A.   I believe, including myself, six agents made entry.

3    Q.   You were the person who spoke to Mr. Daffe?

4    A.   Yes.

5    Q.   What did the other agents do?

6    A.   The other agents were conducting a security sweep to make

7    sure there was no other individuals in the apartment.

8    Q.   So you described this apartment as approximately 700 square

9    feet, correct?

10   A.   Yeah, it was small.

11   Q.   Consisting of a living room and a bedroom and a kitchen?

12   A.   Yeah.  And small living room, small kitchen, yeah.

13   Q.   The other six agents were searching through the apartment

14   to determine what?

15           MS. FORNOS:  Objection, your Honor.

16           THE COURT:  You can answer that.

17   A.   During arrests we search for individuals.

18   Q.   Is that it, just individuals?

19   A.   During arrest warrant, yes, and well, weapons in plain view

20   and things like that.

21   Q.   When you say things like that, what else would you be

22   looking for?

23   A.   Just things in plain view that -- they wouldn't be out in

24   the open -- it wouldn't be like how you conduct a search

25   warrant.

Db7ndafh                      Ragusa - cross

1    Q.   When you spoke to Mr. Daffe, where did you do that?

2    A.   Right outside his kitchen.

3    Q.   Was he seated?  Was he standing?

4    A.   At first he was seated, then after that he too stood up and

5    then he -- it varied.

6    Q.   When you told him that you were there to arrest him, you

7    handed him the arrest warrant, correct?

8    A.   I did.

9    Q.   You told him basically what you were arresting him for,

10   correct?

11   A.   Yes.

12   Q.   How soon after that did someone say to you something about

13   the papers in the bin?

14   A.   I don't remember exactly.

15   Q.   Was that the first thing that was brought to your

16   attention?

17   A.   No.  The first thing that was brought to my attention was

18   that there were no other people in the apartment.

19   Q.   Who told you that?

20   A.   I don't remember exactly who.  One of the other agents told

21   me.

22   Q.   Did one of these other agents also bring to your attention

23   the papers in the bin?

24   A.   They did.

25   Q.   When you say papers in the bin, they appear similar to how

Db7ndafh                    Ragusa - cross

 1   they are here in court, correct?

 2   A.  Yes.

 3   Q.  The documents themselves are in envelopes, correct?

 4   A.  Right.

 5   Q.  So when you first looked at the bin, there were no

 6   financial records in plain view, were there?

 7   A.  I believe some were.

 8   Q.  Some were in this bin?  You were able to see in plain view

 9   financial records?

10   A.  I personally, no, but the other agents did.

11   Q.  You personally, when you looked, did you see any financial

12   records?

13   A.  When I looked, yes.

14   Q.  When you looked into the items in the bin, correct?

15   A.  Yes.

16            THE COURT:  Can we just clarify what he's really

17   testifying about.  There seemed to be potentially two stages

18   here.  The first when some other agent brings to his attention

19   the existence of these two bins with documents, and then

20   potentially -- let me ask the simple question, I guess.

21            Agent Ragusa, did you look at any of the documents in

22   the bin before, according to your testimony, Mr. Daffe gave you

23   permission to do so?

24            THE WITNESS:  No.

25            THE COURT:  OK.

Db7ndafh                        Ragusa – cross

1    Q.   When you first looked at the bin, meaning when you first

2    saw it?

3    A.   OK.

4    Q.   Your attention was pointed to it by another agent, correct?

5    A.   Right.

6    Q.   The other agent said to you what?

7    A.   There's two metal bins in the corner of the room by his

8    computer that look like financial documents.

9    Q.   So another agent said to you that he or she thought that

10   there were financial records in the bin, correct?

11   A.   Correct.

12   Q.   They thought that there were financial records in the bin

13   because they had seen them, correct?

14            MS. FORNOS:   Objection.

15            MS. COHEN:   Should I rephrase it, your Honor?

16            THE COURT:   I don't think that's a question that he

17   can possibly answer because you're asking for the operation of

18   some agent's mind.

19   Q.   What was it that you were told by the agent who first saw

20   the documents in the bin?

21   A.   That there were two metal bins in the corner by his work

22   space, by the desk, that there were two metal bins containing

23   financial documents.

24   Q.   So you were informed by the agent that the bin contained

25   financial documents?

Db7ndafh                        Ragusa - cross

1   A.  Correct.

2   Q.  When you then looked over to the bin, what did you see?

3   A.  I saw -- well, I was still by Mr. Daffe.  I could see the

4   metal bins in the corner.  At that point I asked what were in

5   those bins.

6   Q.  You asked Mr. Daffe?

7   A.  Right.

8   Q.  What did he reply?

9   A.  He replied financial papers, work documents.

10  Q.  You said to him what?

11  A.  Is it OK if I look through them.

12  Q.  And he said?

13  A.  That was fine.

14  Q.  Those were his words?  That was fine?

15  A.  Not exactly, but he gave me the OK, that I could look

16  through them.

17  Q.  Do you remember what his exact words were?

18  A.  Not precisely, no.

19  Q.  When you asked this question and he gave this response,

20  where were the other agents in the room?

21  A.  I don't remember exactly, but they weren't searching for

22  anything.  They were standing around throughout the apartment.

23  Q.  Do you know from your own knowledge whether the agent who

24  informed you about these bins had looked in through the

25  documents?

Db7ndafh                       Ragusa - cross

1   A.   Can you repeat that one more time?

2   Q.   Sure.  Do you know from your own personal knowledge whether

3   the agent who drew your attention to the bins had actually

4   looked through the items in the bin?

5   A.   I don't know if they had looked through them already.

6   Q.   You don't know?

7   A.   No.

8          THE COURT:  Did you see any other agent actually

9   looking through in some depth the documents before you asked

10  Mr. Daffe if it would be OK for you to look at them?

11         THE WITNESS:  No.  They just pointed them out to me.

12  Q.   Were you watching that, Agent?

13  A.   I was more focused on Mr. Daffe.

14  Q.   The items, when you approached the two bins and you looked

15  into them, the financial records are in envelopes, correct?

16  A.   Correct.

17  Q.   It would be fair to say, would it not, Agent, that you

18  can't remember what it is exactly that Mr. Daffe told you in

19  relation to the bins?

20  A.   Well, even if they were in envelopes, I could tell from

21  what was on the envelopes that they were financial records

22  based on my experience.

23  Q.   What was that?  What information was on the envelopes that

24  made you think they were financial records?

25  A.   Some actually said IRS, some were from banks.

Db7ndafh                           Ragusa - cross

1  Q.  Some were bank statements?

2  A.  Could have been.

3  Q.  When you say they were from banks, what do you mean?

4  A.  Well, at that point I had not opened them to examine them,

5  but I know they were from banks.

6  Q.  So they were correspondence from banks?

7  A.  Yes.

8  Q.  They were correspondence in an envelope that had a bank

9  name on it?

10 A.  Right.

11 Q.  If there was something different, please let me know.  Why

12 don't you tell me what they were.

13          MS. FORNOS:  Your Honor, can we get a clarification

14 here, the time frame.  Is this after consent or is this before?

15 I just want the record to be clear as to when his memory is of

16 what these documents were.

17          MS. COHEN:  I will clarify, your Honor.

18          THE COURT:  OK.  You can try.

19          MS. COHEN:  If the Court would rather.

20          THE COURT:  I was just going to say did you physically

21 approach the files and look at them yourself at any time before

22 you asked Mr. Daffe for permission to do so?

23          THE WITNESS:  No.

24 Q.  Do you know if anybody else did, any of the other agents in

25 the room had?

Db7ndafh                        Ragusa - cross

1   A.  I don't know that.

2   Q.  How long after you reviewed the items in the bin were you

3   then alerted to the computers?

4   A.  I would say a few moments after.

5   Q.  What was told to you?

6   A.  That there was also a computer next to the where the

7   documents were, the desk.

8   Q.  And was the computer on or off?

9   A.  I don't remember.

10  Q.  Did you ever see Mr. Daffe near the computer?

11  A.  No.

12  Q.  You were sort of talking to him the entire time?

13  A.  I was with Mr. Daffe, yeah, in control, yes.

14  Q.  Once you were told about the computers, what did you do?

15  A.  I asked what were on the computers or that computer

16  specifically.

17  Q.  The tower?

18  A.  Yeah, at that point, yeah.

19  Q.  What did he say?

20  A.  He said it was his work computer.

21  Q.  What did you say?

22  A.  I said do you mind if -- well, is it OK if we either review

23  it here or we take it with us to be copied.

24  Q.  Did you tell him at any point that any of those items could

25  be used in a case against him?

Db7ndafh                          Ragusa – cross

1              MS. FORNOS:  Objection, your Honor.

2              THE COURT:  You can answer that.

3    A.  We had read him his Miranda rights.  Well, his consent was

4    asked for, so I believe he was aware.

5    Q.  That still wasn't an answer to my question.  Did you ever

6    advise him the reason why you wanted to take these things?

7              MS. FORNOS:  Objection, your Honor.

8              THE COURT:  Well, I think as a matter of law it is

9    irrelevant.

10   Q.  When you first read Mr. Daffe his rights, what did you read

11   them from?

12   A.  I have a card in my wallet that is standard that we read to

13   arrestees.

14   Q.  Did you have with you other documents that you might need

15   that day?

16   A.  The arrest warrant.

17   Q.  Medical forms?

18   A.  No.

19   Q.  Consent forms?

20   A.  We might have, but not that the -- I don't remember asking

21   about those.

22   Q.  Well, there is a form you use to acquire consent to search,

23   correct?

24   A.  Right.

25   Q.  In fact, you had Mr. Daffe sign one of those, correct?

Db7ndafh                              Ragusa - cross

1   A.   Correct, at 290 Broadway.

2   Q.   Two hours after you left his apartment, correct?

3   A.   Correct.

4   Q.   Why didn't you have him sign that form at the apartment?

5   A.   Like I said before, we were trying to -- generally in

6   arrests we try to make entry and leave in as short a period as

7   possible.  And that's why -- also I probably didn't have the

8   form available, to be honest.  I didn't have it.

9   Q.   So you didn't have the form that day?

10  A.   I don't remember having that form with me at that time.

11  Q.   Do you know whether you did or didn't?

12  A.   Personally I did not.

13  Q.   Do you know if any of the six other agents with you had the

14  form?

15  A.   I do not remember.

16  Q.   Did you ask them that day, that morning in the apartment,

17  does anybody have a consent form?

18  A.   In the apartment, no.

19  Q.   You indicated that it was relatively calm in the apartment,

20  correct?

21  A.   Yes.

22  Q.   There was no yelling I think you testified?

23  A.   Correct.

24  Q.   Why did you have Mr. Daffe sign the consent form two hours

25  later?

Db7ndafh                    Ragusa - cross

1   A.  It's just it would be stronger in court to have a written

2   document showing what items we had taken and also that he

3   understood what we had taken and also his rights.

4   Q.  So you had him sign that two hours after you took the

5   items?

6   A.  Right.  But I wouldn't have left the apartment without

7   getting first verbal consent.

8            MS. COHEN:  Nothing further, your Honor.

9            MS. FORNOS:  Your Honor, can I have a moment.

10           (Pause)

11           MS. FORNOS:  No further questions, your Honor.

12           THE COURT:  Agent Ragusa, if you had asked Mr. Daffe

13   for consent to look at his files and take his computer and he

14   had said no, what would the standard procedure have been at

15   that time?

16           THE WITNESS:  That would be it.  We wouldn't pursue

17   the items any further.

18           THE COURT:  Would you have done anything else?  Would

19   you just have walked away and said, he won't give me consent,

20   therefore, that's it?

21           THE WITNESS:  As a team leader I wouldn't have pursued

22   it any further because we only had an arrest warrant.

23           THE COURT:  OK.  I understand.

24           So you would have left the apartment and left the

25   items in the apartment?

Db7ndafh                          Ragusa - cross

1              THE WITNESS:  Correct.

2              THE COURT:  Would you have done anything to keep them

3     safe?

4              THE WITNESS:  At that point I would have just

5     proceeded with the arrest of Mr. Daffe.  I wouldn't really

6     worry about the items.

7              THE COURT:  After you arrest a defendant, you I assume

8     inform the assistant U.S. attorney working on the case?

9              THE DEFENDANT:  Yes.

10             THE COURT:  Would you have done that -- let me go back

11    a step.

12             Were you interested in looking at these documents and

13    the computer because you thought that they might contain

14    evidence of the case that you were prosecuting against

15    Mr. Daffe?

16             THE WITNESS:  Yes.

17             THE COURT:  So when you informed the assistant, would

18    have informed the assistant U.S. attorney of the arrest, would

19    you have mentioned the documents and the computer?

20             THE WITNESS:  Not specifically.  It depends on what

21    time.  Maybe at 290 when we were processing I would have been

22    more specific as to what we actually took.

23             THE COURT:  No.  This is a hypothetical.

24             THE WITNESS:  OK.

25             THE COURT:  The hypothetical is that you are in the

Db7ndafh                          Ragusa - cross

1  apartment, you ask Mr. Daffe for permission to look at the

2  documents and to take them, and he says get lost.

3              THE WITNESS:  OK.

4              THE COURT:  I'm trying to find out from you in the

5  normal course what would you have done thereafter if you had

6  concluded that the documents and the computer would have

7  contained evidence helpful to you in the prosecution of

8  Mr. Daffe?

9              THE WITNESS:  First, it wasn't my case.  But had it

10 been my case and I was informed of that, I would have said just

11 go ahead with the arrest, but also probably tried to obtain a

12 search warrant.

13             MS. FORNOS:  Your Honor, may I just clarify for the

14 record.

15 REDIRECT EXAMINATION

16 BY MS. FORNOS:

17 Q.  Special Agent Ragusa, are you the case agent on this case?

18 A.  No.

19             THE COURT:  I think maybe that explains the lack of

20 enthusiasm.

21             THE WITNESS:  Yeah.

22 Q.  Who was the case agent on this case?

23 A.  Special Agent Flanagan.

24             MS. FORNOS:  Your Honor, may I please, there is a

25 couple things I want to clarify for the record.

1           THE COURT:  Sure.  OK.

2    Q.  Special Agent Flanagan is the agent on the case.  Was she

3    before that day?

4    A.  No.

5    Q.  Just so that the record is clear, when you were told that

6    there were bins with documents, what's the very next thing that

7    happened?  What did you say to Mr. Daffe?

8    A.  I asked Mr. Daffe what were in those bins.

9    Q.  What did Daffe say?

10   A.  He replied they were financial documents and work

11   documents.

12   Q.  What did you do after that?

13   A.  I asked him if it was OK if we looked through them.

14   Q.  What did Mr. Daffe respond?

15   A.  He replied it was OK.

16   Q.  Did he in any way, shape, or form object to you looking

17   through those documents?

18   A.  No.

19   Q.  You obtained his consent?

20   A.  I did.

21   Q.  Just to be clear, did you obtain his consent for the metal

22   bins?

23   A.  Yes.

24   Q.  For the computer?

25   A.  Yes.

Db7ndafh                    Ragusa – redirect

1   Q.  The tower?

2   A.  Yes.

3   Q.  The MacBook?

4   A.  Correct.

5   Q.  And the iPhone?

6   A.  Yes.

7   Q.  Would you have taken any of those items or instructed

8   anybody in your team to take those items if you had not

9   obtained consent?

10  A.  I would not have.

11          MS. FORNOS:  No further questions, your Honor.

12          THE COURT:  Ms. Cohen?

13          MS. COHEN:  No questions, your Honor.

14          THE COURT:  All right.

15          You are excused.

16          THE WITNESS:  Thank you.

17          (Witness excused)

18          THE COURT:  Does the government have any further

19  witnesses?

20          MS. FORNOS:  No, your Honor.  We are prepared to rest.

21          THE COURT:  Ms. Cohen?

22          MS. COHEN:  Your Honor, the defense will not call any

23  witnesses.

24          THE COURT:  Do you want to make some closing

25  arguments?

Db7ndafh

1          MS. FORNOS:  Certainly, your Honor.  We are prepared

2      to do that, unless the Court would like briefing, but we are

3      prepared to proceed.

4          THE COURT:  I think it is a factual credibility issue.

5      I don't think there is a legal issue.

6          Of course there is a legal issue, but I think you both

7      agree as to the what the law is, and I don't disagree with you.

8          MS. FORNOS:  Thank you, your Honor.  In that case we

9      will go briefly just do some closing arguments.

10          It is well established, your Honor.  We all know the

11      standard.  The Fourth Amendment does protect against

12      unreasonable seizures.  An exception to any Fourth Amendment

13      violation is obtaining consent, and it is well established that

14      consent must be voluntary, by a person who has authority to

15      provide that consent.

16          In this particular case, Mr. Daffe is that person.

17      The evidence here has established that he most certainly

18      provided consent.  The standard for consent is whether it was

19      voluntary.  The evidence here has demonstrated that it was

20      voluntary.  The agent specifically inquired as to every single

21      item that they had seen in plain view.  Mr. Daffe was

22      specifically asked whether they could look through the items,

23      or take those items, and Mr. Daffe said yes.

24          Special Agent Ragusa credibly testified that he

25      absolutely obtained consent for every single item that the

Db7ndafh

1    defense presently seeks to suppress, namely, the tower

2    computer, the two metal bins with documents contained therein,

3    the iPhone, and the MacBook.

4         The totality of circumstances is what the Court has to

5    address, and in this particular case, Special Agent Ragusa

6    credibly testified that Mr. Daffe was calm, he understood what

7    was being asked, there was not a language barrier, he did not

8    ask any questions, he was read his Miranda rights.

9         Mr. Daffe explained what was in the metal bins.  As

10   Special Agent Ragusa credibly testified, he specifically asked

11   Mr. Daffe for consent and Mr. Daffe provided that consent.

12        Under the totality of circumstances, there was no

13   coercion.  Special Agent Ragusa credibly testified that there

14   was absolutely no yelling, guns were not drawn, there was no

15   threats or any intimidation.

16        Mr. Daffe not only provided oral consent multiple

17   times during the arrest, but he thereafter provided written

18   consent.  At no point during this entire morning of January 31,

19   2013, did Mr. Daffe withdraw that consent.

20        It is also well established, your Honor, as a matter

21   of law that agents need not inform an arrestee that he has the

22   right to refuse consent.  That is well established.

23        The fact that Special Agent Ragusa did not advise

24   Mr. Daffe is completely not relevant.  Rather, what we know and

25   what the evidence has credibly demonstrated is that the Miranda

Db7ndafh

1    warnings were given to him not only once in the apartment, but

2    a second time when he was being processed at 290 Broadway.

3           We would also note, your Honor, that the law is very

4    well established that consent need not be in writing.  Consent

5    can be express, consent can be implied, and certainly the

6    express can be oral or it can be written.

7           The key issue here is was it voluntary under a

8    totality of circumstances analysis.  The government submits

9    that it was most certainly voluntarily provided, not once, but

10   twice when he signed the consent later on, during the

11   processing and that's submitted into evidence as Exhibit 1.

12          Accordingly, your Honor, the government respectfully

13   requests that the Court deny the motion to suppress the

14   specific items at issue, the documents contained in the metal

15   bin, the tower, the MacBook computer, and the iPhone.

16          THE COURT:  Ms. Cohen.

17          MS. COHEN:  Yes, your Honor.

18          The law is clear in this area that the government has

19   the burden of proving the consent by a preponderance of the

20   evidence.  The consent must not just be voluntary.  It has to

21   be unequivocal and intelligent.

22          In this case, the Court should look at the totality of

23   the circumstances.  A knock on your door at 8 o'clock in the

24   morning and seven agents come into your apartment indicating

25   that you are now under arrest for a federal offense.

Db7ndafh

1          Mr. Daffe spoke with Agent Ragusa, who told the Court

2     honestly that another agent had indeed looked at the items in

3     the bin.

4          I think the Court itself can look at the bin as it

5     sits here.  You can't distinguish what kind of documents are in

6     the bin.  So it's clear that, prior to consent, some type of

7     review of those documents had taken place.  Whether it was

8     cursory or whether it was more in depth we don't know, because

9     it wasn't done by this agent.  But this agent testified clearly

10    that he had been told by another agent that there were

11    financial documents in those bins prior to asking for consent.

12         So I would submit, your Honor, that there was in fact

13    a search of those bins and the documents, or at least a cursory

14    review of the documents in those bins prior to any consent

15    being sought or given by Mr. Daffe as to the items in those

16    bins.

17         I would submit that seven agents in a 700-square-foot

18    New York City one-bedroom apartment after you have been read

19    your rights and served with an arrest warrant, they don't have

20    to have their guns out for a person to feel somewhat

21    intimidated.

22         I also think it is somewhat notable that two hours

23    after the items were taken the government agents sought

24    Mr. Daffe's retroactive consent.  I don't think the government

25    has sustained its burden of proving that the consent was freely

Db7ndafh

given and intelligent.  There's no indication that they --

although, again, the law doesn't specify they have to, but it

does specify he has to know what he's consenting to, and I

don't think the government has sustained that burden.

MS. FORNOS:  Your Honor, may I be heard?

THE COURT:  Yes.

MS. FORNOS:  Briefly.  We certainly object to any

characterization of the written consent as a retroactive

consent.  Consent is consent.  The question is whether it was

voluntarily provided at the apartment.

The fact that he later signed the written consent does

nothing but reiterate that the same consent was again provided

and at no point was consent withdrawn.

With respect to the assertion that another agent must

have reviewed the documents to determine that they were

financial, we object to that, your Honor.

What the testimony was, Special Agent Ragusa was

focused on Mr. Daffe.  When he was notified that there were

financial documents -- and the Court can look at the bins.  The

testimony was that it was by the computers.  The Court can look

at this, and it is reasonable for someone to infer that they

are financial documents.

Special Agent Ragusa testified, credibly testified

that he specifically asked Mr. Daffe what were in the bins.

It's Mr. Daffe who said financial documents.

Db7ndafh

1          Following that question, Special Agent Ragusa

2     specifically asked, Can we look through those documents?  And

3     Mr. Daffe consented.

4          That consent, your Honor, is voluntary.  If we were to

5     adopt the position that any time agents walk into an apartment

6     to arrest an individual in the morning necessarily means that

7     it is a coercive environment such that no consent could ever be

8     given, that's just simply not the law, your Honor.

9          If that were the case, then no consent could ever be

10    voluntary when agents walk into an apartment to arrest an

11    individual.  And that's simply not the case here based on the

12    totality of the circumstances.

13          THE COURT:  All right.  As I stated earlier, it is

14    common ground that consent is an exception to the Fourth

15    Amendment's prohibition on unreasonable searches and seizures.

16          In this context, I find that Agent Ragusa was a

17    credible witness, and I accept his statement that he asked

18    Mr. Daffe for permission to examine and to remove the files and

19    the computer tower that have been marked in evidence this

20    morning.

21          Agent Ragusa did not exaggerate his testimony.

22    Indeed, his credibility was underscored by his responses to my

23    questioning about what he would have done had Mr. Daffe said

24    no.  It was quite clear that this witness was simply not

25    invested in the case and was simply, based on those answers,

Db7ndafh

1    not motivated to invent a consent that didn't occur.

2              Moreover, Mr. Daffe never withdrew his consent.  He

3    signed the consent form, Exhibit 1, later.  He didn't put any

4    objections on it.  As a footnote I observe that there was no

5    legal requirement that he be informed how the documents or

6    computers seized could be used against him.

7              Finally, to accept the defendant's argument that the

8    presence of agents conducting an arrest creates an intimidating

9    atmosphere would really invalidate virtually any consent to

10   search.  That is not the law.  It has to be more than the

11   inevitable atmosphere that comes from the fact of an arrest.

12   And here indeed there is an absence of some of the more

13   intimidating possibilities:  No guns drawn, handcuffs not on

14   the defendant when he gave consent, and I assume a group of

15   agents that did not look like street crime detectives, who

16   themselves can be actually very scary.

17             So the motion to suppress is denied.

18             Can I ask a question.  What is the difference between

19   the superseding indictment and the original?

20             MS. FORNOS:  It is the exact same charges, your Honor,

21   but to be clear, it's the government's position that there's

22   actually two different types of tax fraud that were conducted

23   by Mr. Daffe.

24             On the one hand, it's the government's position that

25   Mr. Daffe was obtaining refunds based on fraudulent returns

Db7ndafh

1    with false W-2s.  That's what he was doing with other

2    individuals and himself.

3              A separate tax fraud, still tax fraud, is offering to

4    add dependents to his clients.  These are real taxpayers who

5    are filing real W-2s, but they are getting an additional

6    deduction and credit by adding a dependent on their tax return.

7              So each of the counts are the exact same as before,

8    but rather than having one 371 count, we now have two 371

9    counts, one for conspiracy to obtain those fraudulent refunds

10   that are stolen identities and false W-2s, a second 371 count

11   that is conspiring and aiding and abetting the theft of the

12   government funds by enabling a real person with an identity and

13   real job and a W-2 and having an extra dependent put on that

14   tax return.

15             So to avoid any confusion of multiple objects, we

16   thought it best to clarify those two different types of tax

17   fraud.  Thus the 371 count was split into two, the 641 count

18   was split into two, and the 286 count was split into two.

19             That's really the difference in the superseding

20   indictment.

21             THE COURT:  More structural rather than substantive in

22   a change of accusation?

23             MS. FORNOS:  It is not a change in accusations at all,

24   your Honor.  In fact, if we look at the original indictment,

25   the 286 count originally combined and said that it's false

Db7ndafh

 1   claims against the government for both filing or obtaining

 2   refunds from fraudulently filed returns and adding dependents.

 3   So he was always on notice of this.  It's just structurally we

 4   think it makes sense to split the two.  It's different

 5   witnesses for both.  It's a different type of evidence that we

 6   would present for both.

 7             THE COURT:  Is there anything else we need to talk

 8   about today?

 9             MS. FORNOS:  Yes, your Honor.

10             THE COURT:  OK.

11             MS. FORNOS:  One clarification on the Court's denial

12   of the motion to suppress.

13             THE COURT:  Right.

14             MS. FORNOS:  We do have evidence here of the two bins

15   and the tower computer.  There was evidence by Special Agent

16   Ragusa that he obtained consent for the iPhone and the MacBook.

17   Those two were actually returned to Mr. Daffe, so we don't

18   physically have them here.

19             THE COURT:  OK.

20             MS. FORNOS:  We do have copies of the contents of

21   those, but the evidence did establish that Special Agent Ragusa

22   testified that he did get consent.

23             THE COURT:  It would cover those if you intended to

24   use them.

25             MS. COHEN:  Ms. Fornos and I have been working on

Db7ndafh

getting copies of those items in a reviewable form to me.  Just

so the Court is aware, I still don't have copies of the tower

in the possession of the government as of yet, but I know we

are working to get formats that we can both review.

MS. FORNOS:  Well, in fact let me just clarify, your

Honor.  Actually everything was provided to defense counsel,

the iPhone contents were provided in DVD format.  I don't

believe that there's any issue with inspecting that, and a hard

drive of that was indeed provided to defense counsel.  So the

government did make everything available.  We are having some

technical difficulties, whether it's a forensic image and a

viewable image in native files, and I'm working with Ms. Cohen

because I'm having the same issue that Ms. Cohen is having, so

we are working together.

THE COURT:  If you can't read it then the motion won't

matter.

MS. COHEN:  That would be a practical resolution of

the motion.

MS. FORNOS:  Well, your Honor, we're certainly working

to try to cope, work through the technology issues.  But we do

represent, your Honor, that we have produced everything and

made available everything.  We also note for the record that

the iPhone was returned to the defendant and his MacBook

computer was returned to the defendant.  As such, the defense

is not prejudiced in my way, shape, or form by this

Db7ndafh

 1    technological delay.

 2              Nothing further from the government.

 3              MS. COHEN:  Nothing further from the defendant, your

 4    Honor.

 5              THE COURT:  Very good.  Thank you.

 6              MS. COHEN:  Thank you.

 7              THE COURT:  I just took a quick glance at the

 8    confidentiality order.  I'm signing it now.

 9              MS. FORNOS:  Thank you, your Honor.

10              MS. COHEN:  Thank you.

11              THE COURT:  OK.

12              (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

ANTHONY RAGUSA

Direct By Ms. Fornos . . . . . . . . . . . . . . 4

Cross By Ms. Cohen . . . . . . . . . . . . . . .17

Redirect By Ms. Fornos . . . . . . . . . . . . .30

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

  4, 5 and 6   . . . . . . . . . . . . . . . . .11

  1   . . . . . . . . . . . . . . . . . . . . .14

  2   . . . . . . . . . . . . . . . . . . . . .16